IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MARCO ANTONIO GARCIA,<br><br>    Defendant. | CRIMINAL ACTION NO.<br>1:20-cr-00188-LMM-RDC-1 |

## FINAL REPORT AND RECOMMENDATION

Defendant Marco Antonio Garcia has been indicted along with multiple co-defendants on two drug-related charges.[1] (Doc. 52). He now moves to suppress evidence seized as fruits of (1) a warrantless vehicle search conducted on March 20, 2020 following a traffic stop, and (2) an April 3, 2020 search warrant for cellphone data. (Doc. 101). The undersigned held an evidentiary hearing on the matter on November 13, 2020. *See* (Docs. 96, 116). Having fully considered the evidence, the applicable law, and the parties' written and oral arguments, the undersigned **RECOMMENDS** that Defendant's motion to suppress be **DENIED**.

---

[1] Specifically, Defendant has been indicated for conspiracy to possess with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (Count 1); and possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2 (Count 2). (Doc. 52).

## I.   BACKGROUND

The summary that follows is taken largely from the following: (1) the November 13, 2020 evidentiary hearing,[2] at which U.S. Drug Enforcement Agency ("DEA") Special Agent James P. Brown ("Agent Brown") and Georgia State Patrol Trooper Dillon Graves ("Trooper Graves") testified, and (2) a recording and transcript[3] of the March 20, 2020 stop during which many of the operative events took place.

In March 2020, the DEA obtained information from a confidential source ("CS") indicating that the residence at 472 Martin St SE, Unit 3, in Atlanta, Georgia was being used as a methamphetamine stash house. (HT. 6:10-18).  On March 20, 2020, several DEA agents conducted surveillance of both 472 Martin Street and a secondary location at which the DEA believed a drug transaction could take place later that day. (HT. 6:10-21, 12:10-20). During this operation, DEA agents communicated with each other over the radio and through WhatsApp, a text messaging application. (HT. 7:10-17).

At around 11:00 a.m. that day, co-defendant Jessie Bea Jones exited 472 Martin Street and met Mr. Garcia as he drove up to and parked in the driveway of

---

[2] (Doc. 116) (hereinafter "HT. ___").

[3] The Government submitted an audio/video recording of the traffic stop as an exhibit at the evidentiary hearing. (Doc. 115). Subsequently, the Government submitted a transcript of the recording (labeled "tick369903667-tick369909703-video0") (hereinafter "VT. ___").

the residence in a white Nissan Sentra. (HT. 7:18-8:5). Prior to Mr. Garcia's arrival, the DEA had no surveillance information connecting him to the residence. (HT. 17:1-6). Mr. Garcia proceeded to remove a brown cardboard box from his vehicle and Ms. Jones removed a blue duffle bag, after which the two entered the residence. (*Id.*; Doc. 97, Gov. Exhs. 1, 2, 3). A DEA agent witnessing these events described them over the radio and circulated digital photographs of same via WhatsApp. (HT. 8:9-11:24). A few minutes later, Mr. Garcia exited the residence with a black duffle bag, placed it in the Nissan Sentra, and drove away. (HT. 12:10-20.). He was followed by DEA agents. (HT. 13:10-13).

DEA agents continued to surveil Mr. Garcia's vehicle and a short time later requested that Trooper Graves, who was located nearby and whose patrol unit assisted the DEA in drug-trafficking cases, conduct a traffic stop. (HT. 12:21-13:18, 23:3-23, 33:4-7). Agent Brown, who was leading the surveillance of 472 Martin St., testified that, based on decades of training and experience together with the CS's information, he believed Mr. Garcia and Ms. Jones had conducted a drug transaction at the residence. (HT. 5:20, 12:10-20).

Before the traffic stop, Trooper Graves was in contact—by radio and through WhatsApp—with the DEA agents surveilling 472 Martin Street. (HT. 23:7-12, 63:7-13). The surveillance group provided "consistent updates" to Trooper Graves about

3

developments at the residence, including Mr. Garcia's meeting with Ms. Jones and the exchange of "suspicious packages." (HT. 23:13-18, 41:1-3, 63:7-13).

Trooper Graves then proceeded to stop Mr. Garcia's vehicle for a widow-tint violation. (HT. 20:12-15). According to Trooper Graves, the vehicle's window tint was "extremely dark" and prevented him from seeing anything inside. (HT. 26:3-5). Trooper Graves approached and shortly thereafter asked Mr. Garcia to exit the vehicle. (HT. 37:6-7). Mr. Garcia, who was accompanied by a single passenger, presented a valid driver's license along with valid registration and insurance upon request, and Trooper Graves confirmed that he had no outstanding warrants. (HT. 37-23-38:8).

However, Trooper Graves testified that Mr. Garcia's responses to basic questions did not "make sense," as he provided inconsistent information about the vehicle's owner and the person listed on the vehicle's insurance.[4] (HT. 26:13-23). In addition, according to Trooper Graves, when he asked Mr. Garcia about his travel plans, Mr. Garcia had to "stop and think," and he gave conflicting responses while trying to "shy away" from answering.[5] (HT. 26:6-12, 27:12-19). Trooper Graves

---

[4] In response to Trooper Graves's questioning, Mr. Garcia indicated that the vehicle was owned by his fiancé. (VT. 3). When Trooper Graves questioned  Mr. Garcia about the separate individual listed on the vehicle's insurance, Defendant replied: "I don't really know him." (VT. 3). Mr. Garcia then explained that the named insured party was over the age of 25 and was therefore able to obtain a comparatively cheaper insurance rate than he himself could obtain at just 21 years old. (VT. 4).

4

further testified that Mr. Garcia appeared uncomfortable with the questioning and changed the topic of conversation.[6] (HT. 26:24-27:6). Based on his observations and questioning of Mr. Garcia, Trooper Graves suspected criminal activity. (HT. 27:7-9). He thought Mr. Garcia was hiding something and asked for consent to search the vehicle. (HT. 28:7-11). He refused. (HT. 28:13).

---

[5] When Trooper Graves questioned Mr. Garcia about his travel itinerary, he stated that he was "Just driving." (VT. 5). When Trooper Graves asked Defendant where he had just come from, the following exchange took place:

> Trooper Graves: Okay. So, where are y'all coming from before QuickTrip?
>
> Defendant: Ah, we just on highway.
>
> Trooper Graves: I'm saying like where were y'all at?
>
> Defendant: Oh. We're all the way down towards my side.
>
> Trooper Graves: So, what y'all have going on over there?
>
> . . . .
>
> Defendant: Nothing. That's really where I actually came from my house.
>
> Trooper Graves: Oh, okay. I thought you said you were going home.
>
> Defendant: Yeah. I'm about to go home [inaudible].
>
> Trooper Graves: Oh okay. Well, you just said you was coming from home.
>
> Defendant: Yeah. [Inaudible].

(VT. 7-8).

[6] During the exchange regarding Mr. Garcia's travel plans, he inquired about the time and then asked Trooper Graves what he thought "about this whole virus going on." (VT. 5-6).

5

Trooper Graves asked another officer who had arrived at the scene shortly after the traffic stop was initiated to complete the written warning that Trooper Graves himself had already begun. (HT. 43:11-16; VT. 9). While that was taking place, Trooper Graves walked his K-9 partner around Mr. Garcia's vehicle. (HT. 28:21-29:7, 43:3-16; VT. 9). When Trooper Graves initiated the dog sniff, approximately seven minutes and twenty seconds had elapsed since the traffic stop began.[7] (HT. 28:21-29:1, 44:21-23). The dog alerted to the odor of narcotics at the vehicle's driver-side door. (HT. 29:9-12; Doc. 115 at 8:16 mark).

Trooper Graves completed the dog sniff in approximately thirty-five seconds,[8] after which he searched the vehicle. (HT. 29:8-15). During the search, Mr. Garcia stated that there was a bag of cash in the back seat that did not belong to him. (HT. 29:19-25). As Mr. Garcia had indicated, Trooper Graves found a large black duffle bag on the rear floorboard, which contained several large bundles of cash totaling approximately $118,000. (HT. 30:1-4, 16-18). The bag matched the description of the black duffle bag that Mr. Garcia had placed in his vehicle after exiting 472 Martin Street, as Trooper Graves heard described over the radio. (HT. 30:19-22). Trooper Graves also recovered several cell phones from the vehicle and from Mr.

---

[7] The traffic stop commenced at approximately the 0:36 mark on the Government's recording, and Trooper Graves initiated the dog sniff at approximately the 7:53 mark. (Doc. 115).

[8] The dog sniff commenced at approximately the 7:53 mark and was completed at approximately the 8:28 mark. (Doc. 115).

Garcia's person. (HT. 30:23-25). Trooper Graves issued Mr. Garcia a written window-tint warning sometime later that day.[9] (HT. 58:16-18; Govt. Exh. 4).

DEA agents obtained a search warrant for the 472 Martin Street residence on the afternoon of March 20, 2020. (HT. 14:10-12). Inside, the DEA found several kilograms of methamphetamine, an empty duffle bag, a large amount of cash, a money counter, and a drug ledger. (HT. 14:13-22). Some of the methamphetamine was stored inside a cardboard box  similar to the one Mr. Garcia had earlier carried into the residence. (*Id.*).

Days later, on March 23, 2020, a criminal complaint was filed against Mr. Garcia and multiple co-defendants. (Doc. 1). On April 3, 2020, a search warrant was issued for the cellphones seized during the stop. (Doc. 132-1). After the grand jury returned its Indictment in June 2020 (Doc. 52), Mr. Garcia moved to suppress the duffel bag and cellphones seized during the warrantless vehicle search on March 20, 2020 and any information collected during the subsequent warrant search of his cellphones (Doc. 81).  After the evidentiary hearing, Mr. Garcia amended his motion to suppress (Doc. 101), which is now ripe for review.

---

[9] Defendant points out that, according to Trooper Graves, a handwritten copy of the traffic warning was never completed by the assisting officer. (Doc. 128 at 4, 8; HT. 64:14-23). However, Trooper Graves explained that completion of the warning became a secondary concern after his dog alerted to the presence of drugs, and that a digital copy of the traffic warning was completed and issued to Mr. Garcia sometime after the vehicle search was complete. (HT. 21:1-18, 65:1-66:3). The Government introduced a copy of the citation at the evidentiary hearing without objection. (Doc. 97, Gov. Exh. 4).

## II.   THE PARTIES' CONTENTIONS

Mr. Garcia has moved to suppress (1) the black duffle bag containing cash and three cellphones seized during the warrantless vehicle search, and (2) any electronic data obtained through execution of the cellphone search warrant. (Doc. 101 at 6; Doc. 128 at 4-10). He argues that the initial stop of his vehicle was not supported by reasonable suspicion and that the stop was  a  pretext, unlawfully conducted in order to investigate the suspected narcotics transaction. (Doc. 128 at 8).  He also submits that Trooper Graves unlawfully prolonged the traffic stop in order to conduct  the K-9 sniff of his vehicle because "he did not have reasonable suspicion" and that the investigation of the alleged window-tint violation  should have "only require[d] seconds to complete." (*Id*. at 8). Mr. Garcia also argues, derivatively, that because the Government relied on the fruits of the unlawful vehicle search to support the April 3, 2020 cellphone search warrant, exclusion of the former invalidates the latter. (Doc. 101 ¶ 14; Doc. 128 at 9).  In other words, according to Mr. Garcia, any data collected from the warrant search of his cellphones was tainted by the illegality of the initial vehicle search.  Further, he claims the affidavit in support of the warrant failed "to proffer probable cause nexus required by the Fourth Amendment."   (Doc. 128 at 9).   These errors, he submits, undermine the constitutionality of the warrant and justify exclusion of the evidence (*Id.*).

8

In response, the Government maintains that Mr. Garcia's motion should be rejected for two reasons. (Doc. 132 at 4-5).   First, contrary to Mr. Garcia's allegations,  it argues Trooper Graves conducted a lawful K-9 sniff incident to the traffic stop which was partially based on violation of Georgia's window-tint law. (*Id.* at 5-7). The Government contends that the dog sniff did not prolong the traffic stop, but in any case, Trooper Graves had reasonable suspicion to justify the dog sniff based in part on Mr. Garcia's suspicious behavior. (*Id.* at 5).   Second, the Government contends that Trooper Graves had probable cause to believe that Mr. Garcia's vehicle contained drug-trafficking evidence even *before* the traffic stop, based on the collective knowledge of law enforcement personnel involved in the larger investigative operation: "even before stopping [Defendant], Trooper Graves had probable cause – both personally and through the collective knowledge doctrine – to believe that Garcia's car contained evidence of a drug-trafficking offense." (*Id.* at 1, 8-9).   Additionally, the Government states that the affidavit provided probable cause justifying issuance of the search warrant.  However, it also submits that  any evidence collected pursuant to the ensuing warrant search of  Mr. Garcia's cellphones is insulated from attack because the law enforcement officers reasonably and in good faith relied on the warrant issued by a federal magistrate judge. (*Id.* at 9-10).

## III.   DISCUSSION

### a. *The legality of the initial traffic stop*

The Fourth Amendment protects persons from "unreasonable searches and seizures." U.S. Const. amend. IV. "To guarantee this right, the Fourth Amendment generally requires law enforcement officers to obtain a warrant before conducting a search." *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019). Without a warrant, "a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373 (2014). Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983). The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment. *Id.*; *accord Vale v. Louisiana*, 399 U.S. 30, 34 (1970). The Government's burden to establish the application of the warrant exception is by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974). "A preponderance of the evidence simply means an amount of evidence that is enough to persuade the Court that the existence of a fact is more probable than its non-existence." *United States v. Latimore*, No. 1:13-cr-287-TCB, 2014 WL

10

3109183, at *11 (N.D. Ga. July 7, 2014) (Batten, J.) (citing *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 (1997)).

"Under the automobile exception to the warrant requirement, the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *Delva*, 922 F.3d at 1243. (internal quotation marks omitted). "For a warrantless search of an automobile to be constitutional, (1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime." *United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011). "Probable cause exists when there is a fair probability that contraband or evidence will be found in the vehicle under the totality of the circumstances." *Id.* at 1300. "Probable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 241 (1983) (internal quotation marks omitted).

In the instant case, neither party disputes that the automobile was readily mobile.  Mr. Garcia was observed by law enforcement officers driving his vehicle from the Martin Street address prior to Trooper Graves's initiation of the traffic stop. *See, e.g., United States v. Santana*, No. 1:17-CR-408-AT-RGV, 2018 WL 7283633, at *10 (N.D. Ga. Sept. 19, 2018) (finding that a car was readily mobile where the

11

trooper followed the vehicle, pulled it over, and it stopped with no indication that it had ceased to be operational), *adopted by* 2019 WL 365743 (N.D. Ga. Jan. 30, 2019).

As for the second prong of the automobile exception, the Government must establish that there was probable cause to believe that Mr. Garcia's vehicle contained contraband or evidence of a crime. In the case at bar, the Government avers that the collective knowledge of the agents – shared with Trooper Graves – established probable cause to stop and search Mr. Garcia's car even before he observed the window-tint violation.  This Court agrees.   Probable cause "exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (internal quotation marks omitted). The collective-knowledge doctrine applies, however, only if the law enforcement officers "maintained at least a minimal level of communication during their investigation." *Id.* "Thus, where, like here, the Government proceeds on a 'collective knowledge' theory, the validity of the stop and subsequent search rises and falls on the level of communication between the officer who conducted the stop and the other law enforcement officers who were aware of the facts establishing probable cause." *United States v. Kahn*, No. 1:17-CR-40-SCJ, 2018 WL 2214813, at *6 (N.D. Ga. May 15, 2018).

During the evidentiary hearing, Agent Brown explained that his officers had been engaged in an on-going narcotics investigation.  (HT at 6: 6-7; Doc. 132 at 8-9).  An informant revealed that the Martin Street address was being utilized as a stash house in furtherance of a drug-trafficking conspiracy.  As the agent and several other officers surveilled the residence and surrounding area, they observed Mr. Garcia as he followed Ms. Jones into the residence carrying a cardboard box and departed with the black duffel bag in hand.  These details were shared with Trooper Graves in real time.  Other judges on this court have concluded that this level of communication satisfies the collective-knowledge doctrine. *See, e.g., United States v. Guzman*, No. 1:17-CR-405-TWT-LTW-2, 2018 WL 7361073, at *5 (N.D. Ga. Dec. 13, 2018) (finding sufficient communication where the DEA coordinated with Georgia State Patrol prior to the operation, communicated with the GSP during the operation, and directed the GSP to stop the vehicle), *adopted by* 2019 WL 718371 (N.D. Ga. Feb. 20, 2019); *Khan*, 2018 WL 2214813, at *7 (finding sufficient minimal communications where DEA contacted the trooper prior to the stop, the trooper was on stand-by on the date in question, the trooper had a DEA radio in his car, the DEA was communicating with the trooper by radio on the day of the stop, and the trooper knew what was happening via updates over the DEA radio); *United States v. Agarwal*, No. 1:17-CR-43-TCB-RGV, 2018 WL 3061923, at *10 (N.D. Ga. Apr. 6, 2018) (finding sufficient communications where the DEA contacted Georgia

State Patrol for assistance, the trooper attended the DEA briefing on the morning of the scheduled buy, and the trooper was in communication with the DEA by phone or radio throughout the day to learn the description and movement of the vehicle as well as the timing and location of the transaction).

As emphasized by the Government, the knowledge gathered by the DEA is imputed to Trooper Graves. (Doc. 132 at 9). He "confirmed that he pulled over the white Nisan Sentra because the DEA asked him to conduct a traffic stop. Thus, the collective knowledge of the DEA agents, combined with their training and experience, is the set of facts from which probable cause should be determined." *(Id.)*. This Court concurs. The information shared with Trooper Graves established ample probable cause to believe that Mr. Garcia was likely engaged in the trafficking of narcotics, and that evidence of that drug activity would be found in the vehicle he was driving.

Mr. Garcia argues that one of reasons proffered to justify the vehicle stop – the alleged window-tint violation – was merely a pretext relied upon by Trooper Graves as an excuse to investigate the unrelated narcotics offense. However, an officer's underlying "motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment." *See United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999). Because he could not see through the windows of Mr. Garcia's vehicle, Trooper Graves had reasonable

14

suspicion to believe that the vehicle violated Georgia's window-tint law. It does not matter that the stop was initially prompted at the DEA's direction. *See Simmons*, 172 F.3d at 778. Moreover, Georgia law prohibits materials and glazing on rear windshields and side and door windows that reduce light transmission "to less than 32 percent, plus or minus 3 percent." O.C.G.A. § 40-8-73.1(b)(2). Trooper Graves reasonably believed, based on his observations and experience, that Defendant had committed a traffic violation. [10] Accordingly, these circumstances provide yet another reason Trooper Graves was justified in making the initial traffic stop.

### b. The traffic stop was not unlawfully prolonged

Mr. Garcia also argues that Trooper Graves unlawfully prolonged the stop before he conducted the dog sniff.[11] Even when the police are justified in making a traffic stop under the Fourth Amendment, the duration of that stop "must be limited to the time necessary to effectuate the purpose of the stop." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001); *See Also, Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time

---

[10] Trooper Graves later confirmed by instrument that the tint on Mr. Garcia's vehicle reduced light transmission to 11%, in violation of Georgia law. (HT. 20:16-24, 61:22-62:2).

[11] Defendant's arguments rely heavily on the Eleventh Circuit's recent decision in *United States v. Campbell*, 912 F.3d 1340 (11th Cir. 2019), as to what renders a traffic stop unreasonably prolonged. However, the undersigned notes that a majority of that court voted to grant rehearing *en banc* in *Campbell*, and as a result, vacated the underlying panel decision, 981 F.3d 1014 (11th Cir. 2020). Accordingly, *Campbell* is no longer good law.

reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In other words, "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 349. This means that a stop "exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 350. Ordinary and permissible tasks related to processing a traffic violation include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355.

A dog sniff, by contrast, "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing," and therefore cannot be "fairly characterized as part of the officer's traffic mission." *Rodriguez*, 575 U.S. at 349, 356. The interests that animate the ordinary inquiries incident to a traffic stop—specifically, highway and officer safety—are "interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." *Id.* at 357.

That said, the Supreme Court has held that a dog sniff conducted during a lawful traffic stop does not violate the Fourth Amendment, so long as one of two conditions is met—either (1) the dog sniff does not prolong and "add[] time to" the stop, or (2) the investigating officer has reasonable suspicion of criminal activity

unrelated to the traffic stop itself. *Id.* at 354-55. As explained below, both of these conditions are found in the instant case.

The Eleventh Circuit has described reasonable suspicion as the ability "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Boyce*, 351 F.3d 1102, 1107 (11th Cir. 2003). In that regard, acts that, by themselves, might be innocent can, when taken together, give rise to reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 274–275 (2002). The relevant inquiry in evaluating the presence of reasonable suspicion is "not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *United States v. Tapia*, 912 F.2d 1367, 1370-71 (11th Cir. 1990). To determine whether a suspicion is reasonable, courts evaluate the "totality of the circumstances surrounding the stop, including the collective knowledge of all officers involved in the stop," *United States v. Bishop*, 940 F.3d 1242, 1249 (11th Cir. 2019), so long as the officers "maintained at least a minimal level of communication during their" operation. *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). Consequently, the collective knowledge of all the law enforcement officers involved in the operation is considered in determining whether there was reasonable suspicion to extend a traffic stop. *See, e.g., United States v. Marsh*, 663 F. App'x 888, 893 (11th Cir. 2016) (applying collective knowledge doctrine where arresting officer did

not have all the knowledge forming the basis for probable cause but did maintain communication with DEA agents who did have sufficient knowledge).

Mr. Garcia asserts that the traffic stop was unlawfully prolonged because the window-tint investigation could have completed in "seconds," Trooper Graves improperly relied on the collective knowledge he obtained from his fellow officers to initiate the stop, and the "defendant's responses were only suspicious to [Trooper Graves] because he had already suspected he would find contraband in the car since he left the house they were surveilling." (Doc. 128 at 9). The Government disputes Mr. Garcia's claim that the window-tint investigation could have been completed in mere seconds, submitting that "the video evidence shows that much of the time was spent asking Garcia questions related to the traffic stop." (Doc. 132 at 6-7). This Court agrees. Mr. Garcia's contention that the <u>entire</u> investigation into the window-tint violation could have been completed in a few seconds is implausible.

As for the nature of the questions posed to Mr. Garcia and the likelihood that Trooper Graves's more pressing concern was based on the suspected narcotics transaction, this Circuit has held that when an officer reasonably suspects criminal activity, he may continue the detention as long as is reasonably necessary for the officer to "pursue[] a means of investigation likely to" confirm or dispel his suspicions about the criminal activity. *United States v. Street*, 472 F.3d 1298, 1306 (11th Cir. 2006). Trooper Graves had received continuous updates on the suspects'

18

conduct and was aware that his fellow officers believed Mr. Garcia had just engaged in a narcotics transaction. This collective knowledge, coupled with responses that Trooper Graves deemed inconsistent, created reasonable suspicion that Mr. Garcia was engaged in criminal conduct unrelated to violation of the window-tint ordinance. Where, as here, the initial stop is legal, an officer has "the duty to investigate suspicious circumstances that then [come] to his attention*." United States v. Hardy*, 855 F.2d 753, 757 (11th Cir. 1988) (internal quotations omitted).

Likewise, the K-9 sniff did not unlawfully prolong the traffic stop. As Trooper Graves stated, he asked another officer to complete the window-tint investigation while he led his K-9 around Mr. Garcia's vehicle. The dog sniff took approximately thirty-five seconds, during which time Trooper Graves's partner worked to complete the traffic citation. Less than eight minutes elapsed between the initiation of the traffic stop and the K-9's positive contraband alert; a much shorter delay compared to others that courts have previously approved. *See United States v. Purcell*, 236 F.3d 1274 (11th Cir. 2001)(where fourteen minutes was not found to be an unreasonable time for a traffic stop); *Simmons*, 172 F.3d at 781 (where court found additional 17-26 minutes officers used to complete criminal background check of driver did not unduly prolong traffic stop); *Hardy*, 855 F.2d at 761 (approving a 50-minute stop); *See Also*, *Caballes*, 543 U. S. at 408, (where the Supreme Court found the duration of the traffic stop was not unlawfully

19

prolonged when one officer ran the K-9 as the other continued the investigation).  As a result, Mr. Garcia's contention that the traffic stop was unlawfully prolonged is unsubstantiated.

### c. The constitutional validity of the Search Warrant

Pursuant to *United States v. Leon*, 468 U.S. 897 (1984), the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in objectively reasonable reliance on the warrant and the warrant was issued by a detached and neutral magistrate. *Id.* at 919-22. *See also United States v. Robinson*, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (*Leon* "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause"); *but see United States v. McGough*, 412 F.3d 1232 (11th Cir. 2005) (good-faith exception not applicable where "the search warrant affidavit was tainted with evidence obtained as a result of a prior, warrantless, presumptively unlawful" search).

A judicial officer asked to issue a search warrant must make a practical common-sense decision, given all the facts set out in the application, that there is a fair probability that contraband or evidence of a crime will be found in specified premises. *See Illinois v. Gates*, 462 U.S. 213 (1983). Courts reviewing the sufficiency of warrant applications after-the-fact should not do so in a hyper-

technical manner. Rather, courts must employ a realistic and common-sense approach so as to encourage recourse to the warrant process and to recognize the significant deference afforded to the decisions of the issuing judge. *Id.*; *United States v. Miller*, 24 F.3d 1357 (11th Cir. 1994). Ultimately, the question is "whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). Moreover, regardless of whether it agrees that the affidavit established probable cause, the reviewing court must deny suppression unless the affidavit was so lacking as to render official belief in the validity of the warrant entirely unreasonable. *United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002). This is because the purpose behind the exclusionary rule–to deter law enforcement officers from violating the Constitution–is not met where an officer's reliance on a search warrant issued by a neutral judge was objectively reasonable. *See Leon*, 468 U.S. at 926 (1984).

Under the "good-faith exception" set forth by the Supreme Court in *Leon*, *Id.*, where officers rely in good faith on a facially valid warrant, the evidence secured thereunder should not be excluded even if the warrant ultimately turns out to be defective. Only in four specific situations is the good-faith exception inapplicable: (1) where the issuing magistrate or judge was misled by information in an affidavit that the affiant knew was false or, except for reckless disregard for the truth, should have known was false; (2) where the judicial officer that issued the warrant "wholly

abandoned his judicial role;" (3) where the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where the warrant issued is "so facially deficient…that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. "Good faith" is an objective standard judged by what a reasonable police officer under the circumstances would perceive, not the expert standard of a legally trained judge. *United States v. Taxacher*, 902 F.2d 867, 872 (11th Cir. 1990). Although the Government bears the burden of demonstrating the applicability of the *Leon* good faith exception, *see United States v. Travers*, 233 F.3d 1327, 1331 n. 2 (11th Cir. 2000), it may do so with reference to the warrant itself. *See United States v. Robinson*, 336 F.3d 1293, 1297 (11th Cir. 2003).

In the case at bar, Mr. Garcia asserts the search warrant is constitutionally infirm because Chief Magistrate Judge Alan J. Baverman improperly relied on evidence that was seized as the result of an unlawful traffic stop and  warrantless vehicle search. (Doc. 81 at 5).  Without this evidence, he claims, "agents did not have enough evidence to issue the search warrant for Defendant's cellphones and failed to proffer probable cause nexus required by the Fourth Amendment." (*Id.* at 5-6). Mr. Garcia's arguments are unpersuasive. As the Government notes, the affidavit establishes that Mr. Garcia was observed meeting with his co-conspirator at the suspected stash house, carrying a cardboard box law enforcement officers

believed contained narcotics and was found in possession of more than $100,000 in cash immediately following his meeting with Ms. Jones.  This behavior confirms the conduct the narcotics broker anticipated when he informed the CS that the Martin Street address "was the location that the buyer was to pick up the twenty kilograms of methamphetamine. The broker further said that there would be a female at that location to verify the money….[and] that she utilizes a white Buick." (Doc. 132 at 9-10).  The affiant stated that a white Buick was registered to Ms. Jones and was located at the housing complex where she met with Mr. Garcia. *Id*. These circumstances, proffered by an experienced DEA agent and corroborated by Mr. Garcia's behavior prior to the traffic stop, provided sufficient evidence to establish that there was a fair probability that evidence of a crime would be found in his vehicle.

Finally, once the K-9 alerted to the presence of contraband in Mr. Garcia's vehicle, probable cause for a warrantless search was established. *United States v. Tamari,* 454 F.3d 1259 (11th Cir. 2006)("Our Circuit has recognized that probable cause arises when a drug-trained canine alerts to drugs.");  *United States v. Banks*, 3 F.3d 399, 402 (11th Cir. 1993); *See also*, *United States v. Dunkley*, 911 F.3d 522, 527 (11th Cir. 1990).

Additionally, the affiant described his extensive experience in conducting these investigations and the routine utilization of electronic devices by those involved in

drug trafficking activity, explaining that an "individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime...From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense. (Doc. 132 at 18-19). *See Riley*, 573 U.S. at 401. (recognizing that "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and provide valuable incriminating information about dangerous criminals"); *See Also*, *United States v Henry*, No 1:0-CR-522-1-TCG-GGB, 2010 WL 5559207, AT *10 (N.D. Ga. Dec. 7, 2010) (finding officer's affidavit setting forth background information regarding narcotics conspiracy provided probable cause to lawfully search defendant's computer and cell phone). Thus, the affidavit clearly establishes a nexus between the possession of the cellphones and Mr. Garcia's suspected illegal drug activity.

Because the evidence seized from Mr. Garcia's vehicle was not unlawfully obtained, Magistrate Judge Baverman's reliance on this evidence to support issuance of the search warrant was not improper. Further, because this Court finds that probable cause supported the search warrant, an analysis of the applicability of the *Leon* good-faith exception is unwarranted.

## IV.   CONCLUSION

For all of the reasons presented above, the undersigned **RECOMMENDS** that Defendant's motion to suppress (Doc. 101) be **DENIED**.  Because there are no other pretrial motions related to Defendant Marco Antonio Garcia pending before the undersigned, his case is **CERTIFIED READY FOR TRIAL**.

IT IS SO **RECOMMENDED** on this 10th day of  June 2021.

REGINA D. CANNON
United States Magistrate Judge